IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 22, 2015 Session

**STATE OF TENNESSEE v. DEANDRE D. RUCKER**

**Appeal from the Criminal Court for Davidson County**
**No. 2012-A-471      Mark J. Fishburn, Judge**

---

**No. M2014-00742-CCA-R3-CD – Filed July 9, 2015**

---

The defendant, Deandre D. Rucker, was convicted of first degree premeditated murder and sentenced to life imprisonment. On appeal, he argues that the trial court erred in denying his motion to sever, the evidence is insufficient to sustain the conviction, and the court erred in denying a motion for a mistrial or a cautionary instruction because of prosecutorial misconduct during the State's closing argument. Following our review, we conclude that the defendant's first two assignments of error are without merit. However, we agree that the State's closing argument was improper to such a degree that we reverse the judgment of the trial court and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded for a New Trial**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Jeffrey A. DeVasher and Emma Rae Tennent (on appeal) and Georgia Sims and Aisha McWeay (at trial), Assistant Public Defenders, for the Appellant, Deandre D. Rucker.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; and Rob McGuire and Dina Shabayek, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant and a co-defendant, Quincy Terrell Brando Sharpe, were convicted of first degree premeditated murder as the result of the shooting death of Demetrius O. Riley. We consider in this matter only the direct appeal of Mr. Rucker.

The State's first witness, Evelyn Carter, testified that in October 2009 her seventeen-year-old grandson, Darius Rucker, who was not related to the defendant, lived with her in Nashville. On October 8, 2009, around 1:30 p.m., she was sitting outside her house, drinking coffee, when the co-defendant, Quincy Sharpe, who was a friend of her grandson's, came to her house looking for him, but he was still at school. Between 2:30 and 2:45 p.m., an orange Pontiac, driven by a man she later identified as the defendant, stopped in front of her house. Mr. Sharpe, who appeared to know the driver, got into the car, which then left. Between 3:15 and 3:30 p.m., Mr. Sharpe returned to her house, again as a passenger in the orange car, and now was "[s]cary looking." She said that Mr. Sharpe's "eyes were big," and when she asked, "[W]hat the hell have you done?" he replied, "Uh, nothing, uh, nothing." Mr. Sharpe asked if he could go inside the house and wash his hands and whether she "had some bleach he could use." He took off the shoes he was wearing and put on another pair from her grandson. She overheard Mr. Sharpe's telling her grandson that "he had shot Deboskey," a name she did not recognize. He further told her grandson that "when he shot him he fell and he hit him, he fell, he went over and shot him again and stood there and looked at the blood run out of his mouth." Approximately twenty minutes later, when the "helicopters w[ere] all flying around," Mr. Sharpe called the defendant, saying he "needed to get rid of that orange car," as well as the gun. She said she did not give this information to the police because she feared for her and her grandson's safety.

On cross-examination, the witness acknowledged she had not seen Mr. Sharpe with a gun on October 8, 2009, nor did he appear to have any blood on him that day. She said that she assumed Mr. Sharpe told the defendant to get rid of the orange car and the gun because she had seen the defendant driving the car.

Sammeca Hall testified that the day the victim, also known as Deboskey, was shot, she had been sitting outside on her porch. She saw an orange car driven by the defendant, with one passenger. She heard them saying that "they was gonna handle some whacks," which she thought "could mean anything," including that retribution was about to be had. She said that about thirty to forty minutes after the orange car pulled away, she learned that someone had been shot. On cross-examination, she acknowledged that the passenger in the orange car was not Mr. Sharpe but, rather, her boyfriend at the time, William Stokes. She said that the reason she believed the defendant was driving the vehicle was because she had seen him driving it before, and there was no other vehicle on the street like it. She said that the orange car belonged to the mother of the defendant's child.

Charles Mount, Jr., testified that he was currently incarcerated because of a federal drug trafficking conviction and, previously, had been a cellmate of Mr. Sharpe, who said that he had shot a man three times and "then ran up on him and shot him some more."

Antonio Flenoy testified that around 3:00 p.m. on October 8, 2009, he was walking with the victim, who was a friend, as a burnt orange Pontiac Grand Am drove past them. Five to ten minutes later, "a little dude come down the hill and g[o]t behind [them] and started shooting." He said he did not get a good look at the shooter's face. Mr. Flenoy "struck out running" and saw the victim hit the ground.

Sergeant Noble Taylor said that he had been employed by the Metro Nashville Police Department for eleven years. He said that on August 7, 2009, he stopped an orange Pontiac being driven by the defendant and issued a traffic citation to him.

Dr. Thomas Deering testified that he was a forensic pathologist and that the victim had eight separate gunshot wounds to his torso. Three of these wounds were tangential or superficial, and two likely would have been fatal.

Pat Postiglione testified that he had retired as a sergeant from the Metro Nashville Police Department Cold Case Unit. He said that in October 2010, he received an email from, and later spoke with, Evelyn Carter regarding the victim's murder. Ms. Carter told him that the defendant, driving an orange vehicle, came by her house and picked up Mr. Sharpe a few hours before the victim was killed. As those involved in the matter, she gave the names of the defendant and the co-defendant and of "Chill Will," whose real name was William Stokes.

Marquita Winters testified that she had five children, one of whom had been fathered by the victim, whose nickname was Deboskey. She said that she was acquainted with both the defendant and his co-defendant. About a year after the victim was killed, the co-defendant told her that he was the one who killed the victim and that he would take care of the victim's son as if he were the father.

Norris Tarkington testified that, at the time of trial, he was an investigator employed by the Davidson County District Attorney's Office and previously had been a member of the Metro Nashville Police Department Cold Case Unit. He said that he went to the scene of the homicide the day it occurred. The weapon used by the shooter had not been recovered. In January 2011, while he was a member of the cold case unit, the case was assigned to him. He spoke with Evelyn Carter, who told him of her knowledge regarding the homicide. She told him that she feared for her safety as a result of the

crime, and he advised her not to tell others that she was cooperating. Ms. Carter said that she had moved out of state because of the crime.

Investigator Tarkington further testified that he interviewed William Mount, who had been housed in the same pod as the co-defendant. The co-defendant confessed to Mount that he shot the victim.

Following this testimony, the State rested its case-in-chief.

The co-defendant, Quincy Terrell Brando Sharpe, testified that on October 8, 2009, he was at the house of Evelyn Carter, waiting for her grandson to return home when an orange car arrived, driven by William Stokes, with Steve Kimbrough as a passenger. Mr. Stokes told Mr. Sharpe that he needed his "strap," meaning that he wanted the co-defendant to get Mr. Stokes's gun, which he did. He denied that he asked Evelyn Carter for bleach, washed his hands with bleach while at her house, or took tennis shoes from her grandson. Additionally, he denied telling Marquita Winters that he shot the victim. He further denied shooting the victim or even knowing him, explaining that he was at Evelyn Carter's house when the shooting occurred. On cross-examination, he acknowledged that, at the time of trial, both Mr. Stokes and Mr. Kimbrough were dead. He denied that he confessed the killing to Charles Mount.

Jamie Nelson testified that she was the defendant's mother-in-law. She first met him in September 2009, while taking a leave from a drug rehabilitation program because her daughter had been seriously injured in an automobile accident. She was living with the defendant and her daughter in October 2009 to help take care of her bedridden daughter. She said that the defendant worked the evening shift at a Krystal restaurant, leaving for work between 3:30 and 4:00 p.m., and, on a typical day, would remain at home to help care for her daughter until he had to leave for work. Ms. Nelson had no events listed on her calendar for the day of the shooting, so it would have been a typical day. She did not recall the defendant's being gone for a long period that day. She acknowledged that he drove an orange Pontiac at that time. In the month prior to the trial, she and the defendant spoke several times by telephone.

As a rebuttal witness, the State called Michelle Ray, an investigator with the Davidson County Sheriff's Office, who said that the defendant had used the identification numbers of other jail inmates to place calls to Ms. Nelson, and that, in them, the defendant and Ms. Nelson discussed various matters, including her testimony at the upcoming trial.

## ANALYSIS

### I. Prosecutorial Misconduct During Closing Argument

Since our reversal of this conviction is based upon the State's final argument, we will review this issue first.

Prior to trial, the court denied the defendant's motion for a severance. The defendant then filed a motion to reconsider, apparently prompted by the State's "supplemental discovery response containing information regarding [the defendant's] alleged gang affiliation and social media presence." Subsequently, the trial court entered an amended memorandum opinion describing additional information which the State had provided:

> The State produced hard copies of information taken from [the defendant's] Facebook and Twitter accounts. The Facebook account is set up more as a music page than a personal page and lists the administrator as "Dread Head Drezzy." A picture of [the defendant] is next to the name. Additionally, the contact information lists "D. Rucker" as the only person to contact and lists Mr. Rucker's personal phone number.

> The Twitter account is titled "Tha Real Drezzy 615" with a photo of [the defendant's] head as the main picture and the caption "Dread Head Drezzy." The page describes the person as a "tattoo artist" as well as an "Audio Engineer/Hip Hop Artist/Producer/Musician." The page also contains photos of [the defendant] and a link to a song titled "Duk Down." When the link is opened, another photo of [the defendant] appears with "Drezzy" on the picture and the song is played. Some of the lyrics to the song include: "when you see me you better move around"; "you better duck down cause I'm shootin' round"; "I'm gonna gun 'em down"; "you'll be lyin' on a stretcher, I'll be lyin' to a detective"; and "three holes in his face like a mask."

> The State also presented documents from the Davidson County Sheriff's Office indicating that [the defendant] had admitted in May, 2006, that he had been a member of the 5-2 Hoover Gangster Crip since the age of eighteen (18). Drawings done by [the defendant] showed words and symbols reflecting gang affiliation e.g. "hoover," "crip," and "HGC."

In again denying the motion to sever, the court then instructed how the defendant's alleged gang affiliation was to be dealt with at trial:

-5-

The question then is whether [the defendant] is entitled to a severance based solely on Mr. Sharpe's admission that he committed the homicide to gain rank within the gang. Although the State agrees to redact any reference in the statement to [the defendant], the argument is still made that the gang reference will have a spill-over effect on Mr. Rucker, if for no other reason than the jury will assume he is a gang member because of his association with Mr. Sharpe. However, the court is confident that this concern can be properly and adequately addressed by providing the jury with a limiting instruction that evidence of Mr. Sharpe's gang activity cannot be considered or used by them in their deliberations of [the defendant]. Of course, in doing so, the State is precluded from arguing directly or by inference any gang affiliation of [the defendant] as there exists no evidence to support any such argument.

Accordingly, the court respectfully denies the motion to sever with the clear directive that the State is prohibited in any manner arguing or suggesting that Mr. Sharpe's admitted gang affiliation has any relevance to [the defendant]. Further, the court will give the jury a limiting instruction on the use of this evidence after it is introduced and in the final jury charge.

Later, in his pretrial Motion in Limine #3, the defendant requested a broad bar against the State's use, in any fashion, of material obtained from the defendant's Facebook or Twitter account, including "any music purported to be written and/or produced by him." The motion concluded:

In addition, [the defendant] requests that none of this information be presented to the jury in any form at any time, including during the State's opening or closing argument, during Mr. Quincy Sharpe's opening or closing argument, or jury selection at any time.

Subsequently, at a hearing on the defendants' various pretrial motions, the prosecutor orally responded to Motion in Limine #3 that "[a]s much as I would appreciate being able to use number three, I think the Court has really already ruled on those kinds of things."

At trial, the State's rebuttal argument concluded with the prosecutor's discussing his fondness for rap music, including a partial recitation[1] of the lyrics of "Duk Down,"

---

[1] The lyrics quoted by the State are in italics. Although it is not apparent from the trial transcript, this court was advised during oral argument that these rap lyrics were displayed to the jury during closing argument.

the rap song from the defendant's social media page, with the State asserting, apparently, that these words explained why the co-defendant killed the victim:

> I don't know if this is going to come as a surprise, but I really like rap music, I always have, Snoop Dogg, Jay-Z, now Drake and some others, and I have them because the artistry of that music form can transport me to places that I don't know about. They can describe with vivid, even brutality, things that are foreign to my experience, things that I don't know about. There are obviously like any song anywhere in the world, there are good things, songs about good things and songs about bad things, there are songs that don't have anything to do with rap about good things and bad things, it's the difference between Good Vibrations and Folsom Prison Blues. It's the difference between Nothing but a G thing and a song about somebody getting killed. But music can take us to a different place and it can explain things that we have a hard time explaining ourselves. There's a local rapper who doesn't . . . have anything to do with this case, it's just I heard it, he's local, and describe this lyric. And it's got some rough language and I apologize it says, *"Niggas wanna play, so they going down. Niggas wanna beef, so I cut 'em down. When you see me, you better move around unless you want to duk down."* That's why you drive an orange car. That's why you get your little man to do it for you. *"If you see me, you better move around."* Three o'clock in the afternoon on a Thursday, don't matter, bunch of people, I'll get ya, I'm gonna be feared, I'm to be respected, and so when you get caught up, you won't put my name in it, you'll put the name in it of the two dead guys. It is something incomprehensible, but we know that there are rough men out there ready to do violence, and they do violence when people fear them. It still doesn't give us a good reason why. It is cold comfort to [the victim's family].

Following these statements, the State delivered concluding remarks, which occupy less than a page of the transcript. The defense then requested a bench conference, at which defense counsel sought a mistrial, one of the bases for which was the State's recitation of and arguments regarding the rap lyrics. After arguments of counsel as to this oral motion, the trial court ruled that "none of those things are grounds for a mistrial or even to give a curative instruction to the jury."

The State argues on appeal that although the issue of prosecutorial misconduct for this rebuttal argument was raised and argued in the motion for new trial, it was waived by the defendant because no objection was made until the State's rebuttal argument had concluded.

The failure to object to closing argument at trial waives consideration of an issue on appeal. See Tenn. R. App. P. 36(a); State v. Stephenson, 195 S.W.3d 574, 601 (Tenn. 2006); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (holding that the defendant's failure to object to the State's alleged misconduct during closing argument waives that issue). As we will explain, we conclude that this argument was not waived. The State represented at a pretrial motion in limine hearing, which had included the defendant's request that the State not use the rap lyrics in question "in any fashion" during the trial, including final argument, that "[a]s much as [the State] would appreciate being able to use" these lyrics, the court had already ruled on the matter. Then, at nearly the end of the State's rebuttal argument, the State recited the rap lyrics, complete with racial epithets. One paragraph later, according to the transcript, the State's rebuttal argument was concluded and the defense then objected to use of the lyrics and asked for a mistrial, which the court denied and declined also to give a curative instruction. Because of the State's placement of its improper argument and earlier misleading representation regarding the lyrics, we conclude that the defendant has not waived this issue.

Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). The five generally recognized areas of prosecutorial misconduct in closing argument occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

Tennessee Rule of Criminal Procedure 29.1(b) allows a closing argument to address any evidence introduced at trial. In addition to addressing the evidence, parties may also argue "reasonable inferences." State v. Chico McCracken, No. W2001-03176-CCA-R3-CD, 2003 WL 1618082, at *8 (Tenn. Crim. App. Mar. 24, 2003), perm. app. denied (Tenn. Sept. 2, 2003). When there is improper argument, the court must determine whether the inflammatory statement negatively impacted the defendant. To measure this impact, five factors should be considered: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the

intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. Goltz, 111 S.W.3d at 5-6 (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

We conclude that the State committed prosecutorial misconduct by this portion of the rebuttal argument. Racial insults are not permissible simply because they were in material quoted by the speaker and the words of a "local rapper who doesn't . . . have anything to do with this case." The racial epithets appear to have had no purpose other than to place the defendant in a bad light, appeal to racial prejudice, and, apparently, suggest the defendant occupied a position superior to that of the co-defendant, the defendant getting his "little man" to commit the killing. No attempt was made by the State to tie the violent and belligerent attitude of the rap lyricist to specific actions of the defendant. It is particularly puzzling why, after the defendant had asked at the hearing on his motion in limine that the State would not utilize the rap lyrics in any fashion, to which the State appeared to agree, the State would later quote those very lyrics in the rebuttal argument.

Next, we will determine the effect of this misconduct. The State's case against the defendant was circumstantial, and not overwhelming. In its earlier ruling on the defendant's motion to sever, the trial court determined, regarding the State's arguing "directly or by inference any gang affiliation" of the defendant, that the State was prohibited from "in any manner arguing or suggesting that [the co-defendant's] admitted gang affiliation has any relevance to [the defendant]." The court continued in this ruling that the jury would be given "a limiting instruction on the use of this evidence after it is introduced and in the final jury charge." However, at the conclusion of the trial, the court both declined to give a limiting instruction as to the rap lyrics or to grant a mistrial. As for the intent of the State in making this argument, given its timing in the trial, we can only conclude that it was meant to bolster the State's case in such a way and at a time that the defendant could not respond. See State v. Jackson, 444 S.W.3d 554, 592 (Tenn. 2014) ("[T]he impermissible comment [by the State] came at a critically important juncture in the trial -- the prosecution's final, rebuttal argument to the jury. The defense had no opportunity to respond to the argument.").

Accordingly, we conclude that the State's argument constituted prosecutorial misconduct for which the appropriate remedy, given the circumstantial nature of the State's proof, is to reverse the conviction and remand for a new trial.

## II.  Sufficiency of the Evidence

Although we have concluded that the conviction should be reversed, because of the likelihood of further appellate review of this matter, we will review the defendant's arguments that the convicting evidence is insufficient to sustain the conviction.

When the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence.  State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010).  It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence.  State v. James, 315 S.W.3d 440, 456 (Tenn. 2010).  In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence.  See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human

> atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder, of which the defendant was convicted, is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2010). "Premeditation" is

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

The State's theory was that the defendant was criminally responsible for the acts of his co-defendant, and the trial court instructed the jury as to criminal responsibility. As to this, Tennessee Code Annotated section 39-11-402 provides:

> A person is criminally responsible for an offense committed by the conduct of another, if:
>
> (1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or
>
> (3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the

proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

Id.

Criminal responsibility is not a separate offense but "solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

Taken in the light most favorable to the State, Evelyn Carter testified that, between 2:30 and 2:45 p.m. the day of the homicide, the defendant, driving an orange Pontiac, stopped by her house and motioned to the co-defendant, who got into the car. Antonio Flenoy testified that he was walking with the victim at approximately 3:00 p.m. when they were approached from behind by a man he did not know, who shot the victim as Flenoy ran away. He said that five to ten minutes before the shooting, an orange Pontiac had passed by them. When the co-defendant returned to Ms. Carter's house thirty to forty-five minutes later, he was "[s]cary looking" and told Ms. Carter's grandson that he had shot "Deboskey." Marquita Winters later testified that "Deboskey" was the victim's nickname. Ms. Carter also said that she heard the co-defendant make a telephone call, saying to get rid of the orange car and the gun. She assumed he was talking to the defendant because he had been driving an orange car. Sammeca Hall testified she saw Williams Stokes, her boyfriend, as a passenger in the orange vehicle before the shooting and heard him say they were going to "handle some whacks." She assumed the driver was the defendant because he had such a car.

As additional proof that the defendant drove an orange Pontiac, Sergeant Noble Taylor testified that, on August 7, 2009, the defendant was driving this vehicle when he was stopped for a traffic violation. After the victim in this matter had been killed, the defendant was stopped for another traffic violation on November 21, 2009. The co-defendant confessed killing the victim to Charles Mount, his cellmate, and to Marquita Winters, a friend.

Considering this evidence as a whole, we conclude that a reasonable jury could have found that the defendant was criminally responsible for the acts of the co-defendant's killing the victim.

### III. Severance

The defendant argued both at trial and on appeal that the trial court erred in denying his motion to sever his case from that of his co-defendant. The defendant argues

that the trial court should have granted his severance motion, pursuant to Tennessee Rule of Criminal Procedure 14, which sets out options available when the State intends to introduce at a joint trial the statement of one of the defendants:

> (A) a joint trial at which the statement is not admitted in evidence or at which, if admitted, the statement would not constitute error;
>
> (B) a joint trial at which the statement is admitted in evidence only after all references to the moving defendant have been deleted and if the redacted confession will not prejudice the moving defendant; or
>
> (C) severance of the moving defendant.

Tenn. R. Crim. P. 14(c)(1).

As the defendant explains, the trial court decided to follow option (B), by requiring that the State redact references to the defendant in the version of the co-defendant's statement presented to the jury.

"The decision to sever criminal defendants is wholly within the discretion of the trial court," State v. Mickens, 123 S.W.3d 355, 383 (Tenn. Crim. App. 2003) (citing State v. Maddox, 957 S.W.2d 547, 556 (Tenn. Crim. App. 1997), "and cannot be interfered with absent 'clear abuse.'" Mickens, 123 S.W.3d at 383 (quoting State v. Howell, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000)). This court has held, "[w]here a motion for severance has been denied, the test to be applied in determining whether the trial court abused its discretion is whether the defendant was 'clearly prejudiced' in his defense as a result of being tried with his codefendant[s]." State v. Price, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000). Therefore, we must determine whether the defendants were clearly prejudiced by the trial court's denial of their motion to sever.

The trial court explained in a lengthy and detailed amended memorandum opinion, setting out the positions of both parties, why the defendant's severance motion would be denied and how the court planned to deal with trial problems envisioned by the defendant. Previously, we have set out the court's ruling and rationale in denying the defendant's severance motion. In brief, the court ordered that the State could not argue "directly or by inference any gang affiliation" of the defendant or argue or suggest that the co-defendant's gang affiliation was relevant to the defendant.

Normally, in determining whether a court erred in denying a severance motion, we would review the trial record to see whether the defendant had been prejudiced by the joint trial. In the present appeal, however, we cannot do so, for the State, by suggestive

questions and arguments, implied that the slaying was gang-related.  For instance, in cross-examining the co-defendant, the State asked if he was not trying "to protect" the defendant.  When the co-defendant denied that that was the case, the State then asked if it was not "easier to go to prison as a soldier than a snitch."  Previously, we have concluded that the State's rebuttal argument constituted prosecutorial misconduct.  Thus, while we conclude that the trial court did not abuse its discretion in denying the motion to sever, because of the State's not abiding by the order, the defendant was prejudiced.

Accordingly, we affirm the trial court's determination to deny the severance motion but reverse the judgment and remand for a new trial because of the State's misleading the court, violating the severance order, and committing prosecutorial misconduct during closing arguments.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we reverse the judgment of conviction and remand the matter for a new trial.

_____
ALAN E. GLENN, JUDGE